IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
PANAMA CITY DIVISION

CHRISTINA JACOBS,
        Plaintiffs,

vs.                                                    Case No.:  5:12cv363/MCR/EMT

E. ABAD,
IVAN NEGRON,
        Defendants.
_____/

## REPORT AND RECOMMENDATION

Plaintiff Christina Jacobs, an inmate of the federal Bureau of Prisons ("BOP") proceeding pro se and in forma pauperis, commenced this action by filing a complaint under 28 U.S.C. § 1331 and Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics, 403 U.S. 388, 91 S. Ct. 1999, 29 L. Ed. 2d 619 (1971).[1]  She names two Defendants, Dr. Ivan Negron and Mid-level Practitioner Abad, both of whom were employed at the federal prison camp in Marianna, Florida ("Marianna") at the time of the events giving rise to this action.  Defendants filed a motion to dismiss for failure to state a claim upon which relief can be granted, pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure and 28 U.S.C. § 1915(e)(2)(B)(ii) (doc. 43).  Plaintiff responded in opposition to the motion (doc. 47).

The case was referred to the undersigned for the issuance of all preliminary orders and any recommendations to the district court regarding dispositive matters.  See N. D. Fla. Loc. R. 72.2(C); see also 28 U.S.C. § 636(b)(1)(B)(C), Fed. R. Civ. P. 72(b).  After careful consideration of the issues raised by the parties, it is the opinion of the undersigned that dismissal of this action is warranted.

I.        ALLEGATIONS OF THE AMENDED COMPLAINT[2]

_____

[1] Bivens recognized a private right of action for money damages against federal actors that engaged in alleged violations of the Constitution or laws of the United States.  403 U.S. at 397.

[2] Because this case is before the court on a motion to dismiss, the allegations of the complaint are taken as true and construed in the light most favorable to Plaintiff.  See Davis v. Monroe County Bd. of Educ., 120 F.3d 1390, 1393

In the Amended Complaint (doc. 16), which is the operative pleading, Jacobs alleges that in May of 2010, while she was housed at SFF Hazelton, a BOP institution in Hazelton, West Virginia, she injured her right leg while doing step aerobics (*id.* at 5).[3]  On June 24, 2010, Jacobs went to sick call and was seen by Alicia Wilson, a physician's assistant (*id.*).  Wilson examined Jacobs' leg and noted:  "[Jacobs] winces with pain with palpation of front leg.  Nothing visible.  Probable tendonitis." (*id.*).  Wilson asked Jacobs what was wrong with her leg, and Jacobs responded she injured her lower leg while doing step aerobics (*id.*).  Jacobs told Wilson her leg "hurt really bad," and the pain was worse when she walked on it (*id.*).  Wilson prescribed Indomethacin and issued a medical restriction for no activity on Jacobs' right leg (*id.*).  One week later, Jacobs discussed her pain with the Health Services Administrator, who advised her to file an inmate request (*id.*).  Jacobs submitted the inmate request complaining of pain in her leg (*id.*).

On July 14, 2010, Jacobs arrived at Marianna (doc. 16 at 5).  During her initial intake, she notified medical staff that she had severe pain in her lower right leg (*id.*).  Nurse Ryles advised Jacobs they would discuss the issue in more detail at her "initial check-up" (*id.*).  During the "initial check-up" with Nurse Ryles on July 20, 2010, Jacobs informed Ryles she injured her lower right leg doing step aerobics and was experiencing pain (*id.*).  Jacobs lied to Ryles, telling her that medical staff at SFF Hazelton had ordered an x-ray (*id.*).  Jacobs fabricated this fact in the hope that Ryles would order an x-ray or other diagnostic testing (*id.*).  Nurse Ryles ordered an x-ray the same day, and it was approved by Jacobs' assigned medical provider, Mid-level Practitioner Abad (*id.*).

Jacobs received the x-ray nine (9) days later, on July 29, 2010 (doc. 16 at 5).  The findings were "focal cortical thickening—healing stress fracture" (*id.*).  Two days later, on July 31, Jacobs submitted an inmate request to obtain the results of the x-ray (*id.*).  On August 16,  2010, Jacobs was seen by Abad (*id.* at 6).  Abad read the x-ray and advised Jacobs she had a fractured bone that was healing on its own (*id.*).  Jacobs informed Abad she was still experiencing pain in her leg and walking with a limp (*id.*).  Jacobs requested a referral to an orthopedic specialist (*id.*).  Abad advised

---

(11th Cir. 1997).  Nevertheless, the court observes that the factual assertions included in this section may not be the actual facts.  *See* Montount v. Carr, 114 F.3d 181, 182 (11th Cir. 1997).  Additionally, the court conveys only those factual allegations that are relevant.

[3] The page references used in this Report reflect the page numbers as enumerated in the court's electronic docketing system rather than those the parties may have assigned.

that a referral was not necessary at that time, because the fracture was healing in a straight line (*id.*). Abad provided Jacobs an ankle brace, continued the prescription for Indomethacin, and advised her not to engage in running, jumping, or contact sports for six months (*id.*). Abad also ordered a follow-up x-ray to be performed not later than October 29, 2010 (*id.*). Abad did not order testing to monitor the effects of the Indomethacin in combination with the other medications Jacobs was taking for seizures and high blood pressure (*id.*). Immediately after the appointment, Jacobs informed her counselor, Mr. Batson, of the results of the appointment, and Batson inquired of Nurse Ryles why Jacobs was not provided an orthotic device to shift weight off the leg (*id.*). Ryles told Jacobs she should have raised the issue with Abad, and recommended that she return to the medical department and speak with Abad (*id.*). Jacobs did so, and requested an orthotic device and an appointment with an orthopedic specialist (*id.*). Abad advised Jacobs that her leg was healing on its own, and that she "would be fine" walking on it without an orthotic device (*id.*).

On August 27, 2010, Jacobs complained of pain in her leg to her work supervisor, Mr. Waldron (doc. 16 at 6). Jacobs complained that the ankle brace provided by Abad was not alleviating the pain in her lower leg (*id.*). Waldron contacted the medical department, and Jacobs was seen by Registered Nurse Cloud (*id.*). Cloud asked Jacobs why she was not wearing the ankle brace, and Jacobs responded that the brace was not alleviating the pain in her lower leg (*id.*). Cloud contacted Abad, who directed Cloud to provide Jacobs an Ace bandage (*id.*). Jacobs was reassured that the leg was healing, and she was advised to follow Abad's recommendation to restrict her activities (*id.*). Registered Nurse Cloud discontinued the Indomethacin and prescribed Ibuprofen (*id.*).

On September 2, 2010, Jacobs was seen by Dr. Negron during a follow-up examination (doc. 16 at 6). Negron's notes indicate he "reviewed the x-ray and it appeared to be normal, most likely suffered a bruised bone. Patient doing much better now. Patient was instructed to resume her normal activities." (*id.*). Jacobs told Negron that the x-ray had revealed a healing stress fracture, and she still had pain in her leg at the site of the injury (*id.* at 7). Dr. Negron did not change his assessment or order any restrictions of her activities (*id.*).

On October 21, 2010, Jacobs received the follow-up x-ray ordered by Abad (doc. 16 at 7). The findings were "abnormal: with focal cortical thickening, mid-medial posterior tibial cortex" (*id.*).

Jacobs alleges that on November 14, 2010, she complained of stomach problems, which she associates with the Indomethacin (doc. 16 at 10). However, she does not state to whom she complained (*id.*).

On December 6, 2010, Jacobs was seen by Abad, who noted she "appears in pain" (doc. 16 at 7). On December 20, 2010, Jacobs submitted an inmate request to the medical department, requesting additional diagnostic testing, including a bone density test (*id.*). The next day, Jacobs was summoned to the medical department, where she spoke with Registered Nurse Worlds (*id.*). Jacobs requested a bone density test, but Worlds responded that the medical department "doesn't just order tests like that" (*id.*). Jacobs told Worlds that Abad had ordered an MRI, but Worlds checked the computer and responded that an MRI had not been ordered (*id.*). Worlds told Jacobs her leg "was going to hurt," and she would probably have arthritis in her leg (*id.*). Jacobs spoke with Worlds again on December 29 regarding her request for additional tests (*id.*). Worlds repeated that the type of test Jacobs was requesting would only be ordered and recommended by her medical provider if the provider felt it was necessary (*id.*).

On January 10, 2011, Jacobs was seen by Abad (doc. 16 at 7). Jacobs' pain was noted to be a 2 on the pain scale (*id.*). Jacobs complained of pain in her spine and stomach problems (*id.* at 8, 10). Abad ordered an MRI based upon Jacobs' previous x-rays and complaints of pain (*id.* at 7). On January 23, 2011, Abad advised Jacobs that the Utilization Review Committee denied the request for an MRI (*id.* at 8).

On February 4, 2011, Jacobs submitted another inmate request complaining that her condition was worsening, and she was experiencing pain in her spine from having to limp (doc. 16 at 8). The medical department scheduled an appointment for February 10, but the appointment was cancelled (*id.*). On February 14, Jacobs filed an inmate request complaining of nagging pain in her leg and that her appointment had been cancelled (*id.*). On February 16, 2011, Jacobs saw Abad outside the medical department near the institution's beauty salon (*id.*). Jacobs complained that she still had pain in her spine, nagging pain in her leg, and tingling and prickling in her foot (*id.*). Abad advised Jacobs that she would take care of her, and that her x-ray had come back normal (*id.*). Jacobs states the x-ray to which Abad was referring was of her left leg, which she injured when it was hit by a dumpster (*id.*). Abad responded, "sue, sue, sue" and asked when Jacobs was expected

to be released (*id.*). Jacobs explained she was in severe pain in her spine and right leg, and her limp was worsening (*id.*). Abad advised her to take her prescribed pain medication (*id.*).

On March 9, 2011, Jacobs asked Abad why the previously scheduled appointment had been cancelled (doc. 16 at 9). Abad responded that the appointment would be rescheduled (*id.*). Jacobs complained of pain in her spine, and that her limp was worsening (*id.*). Abad reassured her the appointment would be rescheduled (*id.*). Jacobs submitted an inmate request to the medical department the next day, reiterating what she told Abad and complaining that she was experiencing numbness and prickling in her foot (*id.*). Jacobs noted she was still taking Indomethacin, but was concerned that the effects of the medication, in combination with her other medications for seizures and high blood pressure, were not being monitored (*id.*). Jacobs was scheduled for a medical appointment on March 16, but when she reported to medical, Nurse Worlds informed her the appointment had been cancelled (*id.*). Jacobs did, however, receive a blood test (*id.*). Nurse Worlds advised Jacobs to direct her complaints regarding the cancelled appointments to Ms. Saad in Administration, because there was nothing that she (Worlds) or Abad could do (*id.*). Jacobs spoke with Saad on March 17 (*id.*). Saad contacted Dr. Toledo regarding Jacobs' condition and her pain, but Toledo responded there was nothing he could do for Jacobs except keep her on pain medication (*id.*). Later that day, Jacobs was called to the medical department and seen by Abad (*id.*). Abad observed Jacobs as she performed exercises with her right leg, and saw that Jacobs was in pain (*id.*). Abad ordered immediate x-rays of Jacobs' back, right side, hip, and leg (*id.*). She also prescribed steroids for five days, and issued a six-day medical restriction for no activity (*id.*). Jacobs received the x-ray that day (*id.*). Jacobs' pain lessened while she was on the steroids, but it returned in her leg and back when the five-day prescription expired (*id.*).

On April 11, 2011, Jacobs was seen by Abad (doc. 16 at 9). Jacobs requested the results of the x-rays and blood test (*id.*). The blood test showed an elevated "BUN" level, so Abad discontinued the Indomethacin (*id.*). Abad noted in Jacobs' medical file, "she has no limping," but Jacobs contends she had a "pronounced limp" (*id.*). Three days later, on April 14, Jacobs was seen by Dr. Toledo (*id.*). He advised her that he would monitor her right leg and back, and if she was still experiencing pain, he would change the course of treatment (*id.*). Toledo ordered x-rays to be taken by July, and he told her the pain medications would be changed every three (3) months to avoid stomach problems and any potential damage to her liver or kidneys (*id.*).

On June 14 and July 4, 2011, Jacobs submitted inmate requests to the medical department complaining of pain in her leg and back (doc. 16 at 10). She was seen by Dr. Toledo on July 7, and he ordered x-rays and blood tests (*id.*). Jacobs did not receive the x-ray until September 22, 2011 (*id.*). The findings were "negative except for: smooth cortical thickening of medial tibia" (*id.*).

On October 14, 2011, Jacobs was seen by Nurse Ryles (doc. 16 at 10). Jacobs complained of diarrhea and stomach pain from the Indomethacin (*id.*). On November 22, 2011, Jacobs submitted an inmate request to medical complaining that a medical appointment for earlier that month had been cancelled, and she was still experiencing pain in her leg and back (*id.*). Jacobs from transferred from Marianna on December 14, 2011 (*id.*).

Jacobs alleges she still suffers from the following:

> . . . pain in her spine, with pain prominent in the lower (R) side, around the hip area; tingling and pinprick feelings in the bottom of her (R) foot; feelings of being off balance with the (L) knee/leg being favored from the injured (R) leg; stomach upset with symptoms ranging from severe constipation to excessive diarrehea [sic], with nausea; walking with a pronounced limp; mental and emotional pain and suffering, anxiety; loss of enjoyment of life; disfigurement; disability; future medical expenses; loss of future earning capabilities; post-traumatic arthritis.

(doc. 16 at 11).

Jacobs claims that Dr. Negron and Mid-level Practitioner Abad were deliberately indifferent to her medical needs, in violation of the Eighth Amendment (doc. 16 at 12). Jacobs claims that Abad was deliberately indifferent by (1) failing to provide an orthotic device to shift weight off her injured leg, (2) failing to prescribe an effective pain medication that was compatible with other medications she was taking, and (3) failing to refer her to an orthopedic specialist (*id.* at 12–13). Jacobs claims that Dr. Negron was deliberately indifferent by (1) failing to accurately read her medical records, including the x-ray, (2) failing to order additional tests to determine the full extent of the injury, and (3) failing to refer her to an orthopedic specialist (*id.* at 13). Jacobs seeks compensatory damages in the amount of $4,080,000.00, punitive damages in the amount of $75,000.00, and nominal damages in the amount of $75,000.00 (*id.* at 12).

## II.    LEGAL STANDARDS

### A.    Failure to State a Claim

Dismissals for failure to state a claim are governed by Rule 12(b)(6) of the Federal Rules of Civil Procedure. Fed. R. Civ. P. 12(b)(6). The allegations of the complaint are taken as true and

are construed in the light most favorable to the plaintiff. <u>Davis v. Monroe Cnty. Bd. of Educ.</u>, 120 F.3d 1390, 1393 (11th Cir. 1997). However, such acceptance should not be given blindly; only well-pleaded factual allegations are taken as true and only reasonable inferences are drawn in favor of the plaintiff. *See* <u>Oladeinde v. City of Birmingham</u>, 963 F.2d 1481, 1485 (11th Cir. 1992); <u>Marrero v. City of Hialeah</u>, 625 F.2d 499, 502 (5th Cir. 1980);[4] *see also* <u>Long v. Satz</u>, 181 F.3d 1275, 1278 (11th Cir. 1999) (per curiam) ("reasonable inferences" drawn); <u>Associated Builders, Inc. v. Ala. Power Co.</u>, 505 F.2d 97, 100 (5th Cir. 1974) ("unwarranted deductions of fact are not admitted as true"). A plaintiff must allege more than mere "labels and conclusions"; the complaint must include "[f]actual allegations . . . [sufficient] to raise a right to relief above the speculative level." <u>Bell Atl. Corp. v. Twombly</u>, 550 U.S. 544, 127 S. Ct. 1955, 1964–65, 167 L. Ed. 2d 929 (2007) (citations and internal quotations omitted). Indeed, "[m]ore than mere conclusory notice pleading is required . . . . A complaint will be dismissed as insufficient where the allegations it contains are vague and conclusory." <u>Gonzalez v. Reno</u>, 325 F.3d 1228, 1235 (11th Cir. 2003) (quotation marks and alteration omitted); *see also* <u>Weissman v. Nat'l Ass'n of Sec. Dealers</u>, 500 F.3d 1293, 1305 (11th Cir. 2007) (en banc) (Tjoflat, J., dissenting) ("[A]ny conclusory allegations, unwarranted deductions of fact or legal conclusions masquerading as facts do not prevent dismissal.") (citing <u>Associated Builders, Inc.</u>, 505 F.2d at 99).

To survive dismissal, "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." <u>Ashcroft v. Iqbal</u>, 556 U.S. 662, 678, 129 S. Ct. 1937, 1949 (2009) (quotation marks omitted). A claim is plausible on its face where "the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* Plausibility means "more than a sheer possibility that a defendant has acted unlawfully." *Id.* "Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief." *Id.* (internal quotation marks omitted). In sum, while only a short and plain statement is required, it must have more than bare assertions that

---

[4] In <u>Bonner v. City of Prichard</u>, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), the Eleventh Circuit adopted as precedent all of the decisions of the former Fifth Circuit decided prior to October 1, 1981.

"the-defendant-unlawfully-harmed-me." *Id.* (citing <u>Twombly</u>, 550 U.S. at 555); *see also* Fed. R. Civ. P. 8(a).

Pro se pleadings are to be liberally construed. *See* <u>Tannenbaum v. United States</u>, 148 F.3d 1262, 1263 (11th Cir. 1998). However, courts are not required to "rewrite an otherwise deficient pleading in order to sustain an action." *See* <u>GJR Inv., Inc. v. Cnty. of Escambia, Fla.</u>, 132 F.3d 1359, 1369 (11th Cir. 1998).

B.    <u>Sovereign Immunity</u>

The doctrine of sovereign immunity precludes a <u>Bivens</u> claims for monetary relief against an individual defendant in his official capacity. Official capacity claims for monetary damages based upon allegations of constitutional violations are barred because they are considered suits against the United States which has not waived its sovereign immunity for such claims. *See* <u>FDIC v. Meyer</u>, 510 U.S. 471, 484–86, 114 S. Ct. 996, 127 L. Ed. 2d 308 (1994); <u>Kentucky v. Graham</u>, 473 U.S. 159, 165–67, 105 S. Ct. 3099, 87 L. Ed. 2d 114 (1985).

C.    <u>Qualified Immunity</u>

Qualified immunity shields government officials from civil damages liability unless the official violated a statutory or constitutional right that was clearly established at the time of the challenged conduct. *See* <u>Ashcroft v. al-Kidd</u>, — U.S. —, 131 S. Ct. 2074, 2080, 179 L. Ed. 2d 1149 (2011). In <u>Pearson v. Callahan</u>, 555 U.S. 223, 236, 129 S. Ct. 808, 172 L. Ed. 2d 565 (2009), the Supreme Court held that courts may grant qualified immunity on the ground that a purported right was not "clearly established" by prior case law, without resolving the often more difficult question whether the purported right exists at all. 555 U.S. at 227. This approach comports with courts' usual reluctance to decide constitutional questions unnecessarily. *Id.* at 241; *see also* <u>Camreta v. Greene</u>, — U.S. —, 131 S. Ct. 2020, 2030–31, 179 L. Ed. 2d 1118 (2011); <u>al-Kidd</u>, 131 S. Ct. at 2080.

To be clearly established, a right must be sufficiently clear "that every 'reasonable official would [have understood] that what he is doing violates that right.'" <u>Al-Kidd</u>, 131 S. Ct. at 2078 (quoting <u>Anderson v. Creighton</u>, 483 U.S. 635, 640, 107 S. Ct. 3034, 97 L. Ed. 2d 523 (1987)). In other words, "existing precedent must have placed the statutory or constitutional question beyond debate." *Id.* at 2083. This "clearly established" standard protects the balance between vindication of constitutional rights and government officials' effective performance of their duties by ensuring

that officials can "'reasonably . . . anticipate when their conduct may give rise to liability for damages.'" Anderson, 483 U.S. at 639 (quoting Davis v. Scherer, 468 U.S. 183, 195, 104 S. Ct. 3012, 82 L. Ed. 2d 139 (1984)).

A judicial precedent with materially identical facts is not essential for the law to be clearly established, but the preexisting law must make it obvious that the defendant's acts violated the plaintiff's rights in the specific set of circumstances at issue.[5] See Evans v. Stephens, 407 F.3d 1272, 1282 (11th Cir. 2005) (en banc). In determining whether a right is clearly established, the relevant, dispositive inquiry is "'whether it would be clear to a reasonable [official] that his conduct was unlawful in the situation he confronted.'" Brosseau v. Haugen, 543 U.S. 194, 125 S. Ct. 596, 160 L. Ed. 2d 583 (2004) (emphasis added) (quoting Saucier v. Katz, 533 U.S. 194, 201–02, 121 S. Ct. 2151, 150 L. Ed. 2d (2001)); see also Youmans v. Gagnon, 626 F.3d 557, 563 (11th Cir. 2010). "This inquiry, it is vital to note, must be undertaken in light of the specific context of the case, not as a broad general proposition . . . ." Saucier, 533 U.S. at 201.

The Supreme Court has warned against allowing plaintiffs to convert the rule of qualified immunity into "a rule of virtually unqualified liability simply by alleging violation of extremely abstract rights." Anderson, 483 U.S. at 639. More than a general legal proposition—for example, to act reasonably—is usually required; if a plaintiff relies on a general rule, it must be obvious that the general rule applies to the specific situation in question. See Brosseau, 543 U.S. at 199 (noting that general tests may be sufficient to establish law clearly in "an obvious case"). Minor variations between cases may prove critical. See Marsh v. Butler County Ala., 268 F.3d 1014, 1032 (11th Cir. 2001) (en banc). Thus, evaluating the "objective legal reasonableness" of an official's acts requires examining whether the right at issue was clearly established in a "particularized" and "relevant" way. Anderson, 483 U.S. at 640. The unlawfulness of a given act must be made truly obvious, rather than simply implied, by the preexisting law. See id.

The plaintiff bears the burden of showing that the law allegedly violated was clearly established at the time that the defendants acted; the defendants have no obligation to prove it was

---

[5] Very occasionally, qualified immunity can be denied where the plaintiff establishes that the defendant's conduct so obviously violated federal law that the defendant must have known the acts violated federal law even in the absence of preexisting case law addressing materially similar facts. See, e.g., Priester v. City of Riviera Beach, Fla., 208 F.3d 919, 926–27 (11th Cir. 2000).

not. *See* <u>Barts v. Joyner</u>, 865 F.2d 1187, 1190 (11th Cir. 1989) ("To defeat a qualified immunity defense, plaintiff bears the burden of showing that 'the legal norms allegedly violated by the defendant were clearly established at the time of the challenged actions, or . . . the law clearly proscribed the actions the defendant . . . took.'"); <u>Johnson v. Clifton</u>, 74 F.3d 1087, 1091 (11th Cir. 1996) ("In the qualified immunity context, the plaintiffs have the burden of proving that a reasonable public official would not have believed that his actions were lawful, in light of clearly established law"); <u>Spivey v. Elliott</u>, 41 F.3d 1497, 1499 (11th Cir. 1995) ("[i]t is the plaintiff's burden to show that when the defendants acted, the law established the contours of a right so clearly that a reasonable official would have understood his acts to be unlawful.").

While qualified immunity is typically addressed at the summary judgment stage of the case, the defense may be raised and considered on a motion to dismiss. <u>Chesser v. Sparks</u>, 248 F.3d 1117, 1121 (11th Cir. 2001). The motion will be granted if the "complaint fails to allege the violation of a clearly established constitutional right." <u>Williams v. Ala. State Univ.</u>, 102 F.3d 1179, 1182 (11th Cir. 1997). Whether the complaint alleges such a violation is a question of law. <u>Chesser</u>, *supra*. Once pled, qualified immunity is an immunity from suit and not merely a defense from liability. *Id.* (citing <u>Mitchell v. Forsyth</u>, 472 U.S. 511, 526, 105 S. Ct. 2806, 86 L. Ed. 2d 411 (1985)). Consequently, the Supreme Court has consistently instructed that the question of an official's immunity must be determined at the earliest possible stages of litigation. *See* <u>Saucier</u>, 533 U.S. at 201; <u>Marsh</u>, 268 F.3d at 1022.

D.     <u>Eighth Amendment</u>

Prison officials violate the Constitution when they act with deliberate indifference to an inmate's serious medical needs, giving rise to a cause of action under § 1983. *See* <u>Estelle v. Gamble</u>, 429 U.S. 97, 104–05, 97 S. Ct. 285, 291, 50 L. Ed. 2d 251 (1976). To prevail on a claim of deliberate indifference, a plaintiff must show (1) a serious medical need; (2) deliberate indifference to that need on the part of the defendant; and (3) causation between the defendant's indifference and the plaintiff's injury. *See* <u>Mann v. Taser Int'l, Inc.</u>, 588 F.3d 1291, 1306–07 (11th Cir. 2009). A serious medical need is "one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Id.* at 1307 (quotation omitted). Alternatively, a plaintiff can establish a serious medical need by showing that a delay in treatment worsened his or her condition. *Id.*

To establish deliberate indifference, a plaintiff must show "(1) a subjective knowledge of a risk of serious harm; (2) disregard of that risk; and (3) by conduct that is more than mere negligence." Brown v. Johnson, 387 F.3d 1344, 1351 (11th Cir. 2004). Indeed, to show deliberate indifference, the defendant's response to the medical must be more than "merely accidental inadequacy, negligence in diagnosis or treatment, or even medical malpractice actionable under state law." Taylor v. Adams, 221 F.3d 1254, 1258 (11th Cir. 2000) (citation and quotations omitted). Conduct that is more than mere negligence includes: (1) knowledge of a serious medical need and a failure or refusal to provide care; (2) delaying treatment for non-medical reasons; (3) grossly inadequate care; (4) a decision to take an easier but less efficacious course of treatment; or (5) medical care that is so cursory as to amount to no treatment at all. *See* McElliott v. Foley, 182 F.3d 1248, 1255 (11th Cir. 1999). A simple difference in medical opinion between the medical staff and an inmate as to the latter's diagnosis or course of treatment does not establish deliberate indifference. *See* Adams v. Poag, 61 F. 3d 1537, 1545 (11th Cir. 1995) (the question of whether a plaintiff should have received different diagnostic tests or treatments is not an appropriate basis for grounding liability on a deliberate-indifference claim); Harris v. Thigpen, 941 F.2d 1495, 1505 (11th Cir. 1991).

III.    ANALYSIS

Abad and Negron seek dismissal of the Amended Complaint, on the ground that it fails to state a claim upon which relief can be granted, pursuant to Rule 12(b)(6) and § 1915(e)(2)(B)(ii) (doc. 43). Defendants contend Jacobs' allegations show she received a diagnosis, treatment, several x-rays, pain medication, an ankle brace, and multiple follow-up appointments with them regarding her medical condition. They argue they acted according to their medical judgment in assessing and repeatedly following up on the condition, with no suggestion of willful and wanton disregard for her medical condition, and no suggestion of conduct exceeding negligence; therefore, Jacobs' allegations fail to show an Eighth Amendment violation (*id.* at 10–16). Abad and Negron further contend that even if Jacobs' allegations show a constitutional violation, they are entitled to qualified immunity, because the state of the law at the time of their conduct did not give them clear warning that their conduct was unconstitutional (*id.* at 8–10, 16–17).

In response, Jacobs argues that Abad and Negron's knowledge that she was diagnosed with a fractured leg, and their knowledge that she was in continuous pain demonstrate they were

subjectively aware that her condition posed a substantial risk of serious harm to her health (doc. 47). She argues Abad's failure to provide an orthotic device, failure to prescribe effective pain medication and monitor the effects of the Indomethacin, and failure to refer her to an orthopedic specialist was so cursory and ineffective that it amounted to no treatment at all and in fact constituted deliberate mistreatment likely to aggravate her condition (*id.*). She argues Negron's assessing her injury as a bruised bone instead of a fracture, his failure to order further diagnostic tests and refer her to a specialist, and his failure to monitor the effects of the Indomethacin was more than negligent and rose to the level of incompetence (*id.*). In support of her position, Jacobs submitted an affidavit from Dr. Cherron Jenkins, a licensed chiropractor, as well as a "general internet printout" regarding the standard of care for tibial stress fractures, which Jacobs asserts set forth the standard of care applicable to her injury (doc. 47, Exs. A, B). Jacobs also submitted e-mail exchanges with her mother (*id.*, Ex. C), and internet articles regarding the side effects of Indomethacin and elevated BUN levels (*id.*, Ex. D). Jacobs cites <u>Carswell v. Bay County</u>, 854 F.2d 454 (11th Cir. 1988) as clearly establishing that Defendants' conduct violated the Eighth Amendment.

The facts of <u>Carswell</u> are as follows:

On August 21, 1984 Carswell was committed to the Bay County Jail in Panama City, Florida, as a pre-trial detainee. Carswell was not given a physical examination at the time he entered the jail, but he indicated during the medical screening procedure that he was not suffering from any ailment or taking any medication. At the time he entered Bay County Jail Carswell was 5' 11" and weighed approximately 145 pounds.

Over the next eleven weeks Carswell repeatedly requested medical treatment. Complaining of a rash, constipation and significant weight loss, Carswell made numerous written and oral requests for medication and medical attention. Labeled a "complainer," Carswell received the medication he requested, generally milk of magnesia, on some occasions but other requests simply were ignored. On two occasions during this period [Defendant] Graham Belz, a physician's assistant who worked at the jail, examined Carswell. On September 18 Belz prescribed a cream for the skin rash. On October 2 Belz diagnosed Carswell as having tonsillitis and constipation, and prescribed medication accordingly. Carswell, however, continued to complain about health problems.

On November 5, 1984 Carswell was taken to court for arraignment. The public defender observed that the plaintiff "looked like a concentration camp

victim." The public defender immediately asked [Defendant] William Grigsby, the jail administrator who had accompanied Carswell to the arraignment, to arrange for medical attention. Despite his own recognition that Carswell was emaciated and needed medical attention, Grigsby testified that upon returning to the jail he simply yelled into a crowded room: "Get this man to see the doctor."

Two days later, on November 7, Belz examined Carswell again. Carswell had then lost approximately fifty-three pounds, and weighed only ninety-two pounds. That evening Carswell was admitted to the hospital where he was diagnosed as a diabetic. Carswell remained hospitalized for approximately two months and eventually recovered.

854 F.2d at 455–56 (footnote omitted). Carswell brought a § 1983 action asserting an Eighth Amendment claim of deliberate indifference to his serious medical needs. The case proceeded to trial. The jury returned a verdict against Grigsby and Belz.

On appeal to the Eleventh Circuit, Grigsby and Belz argued there was insufficient evidence to support the jury's finding of deliberate indifference. 854 F.2d at 457. The Eleventh Circuit determined there was sufficient evidence of deliberate indifference:

We think the jury properly could find that the acts of Grigsby and Belz constituted deliberate indifference. The evidence in this case established that Grigsby and Belz had knowledge of Carswell's need for medical care. The record indicates that two persons on the jail's staff, Emergency Medical Technician Monroe and Correctional Officer Eldridge, each recognized Carswell's medical problems and informed Belz of Carswell's serious situation. Each time, however, Belz ignored the warnings. Belz also failed to advise Merrill of Carswell's weakening condition. The evidence further established that Grigsby saw Carswell's deteriorating condition during rounds at the jail, received a request specifically addressed to him from Carswell for medical attention and was asked by the public defender to get Carswell to a doctor. Grigsby still did nothing significant to ensure that Carswell received medical attention.

*Id.*

Judicial decisions addressing deliberate indifference to a serious medical need are very fact specific. Youmans, 626 F.3d at 564. In the instant case, the facts admitted by Jacobs do not suggest that Abad and Negron ignored her medical problem, or that they provided treatment that could be remotely characterized as insignificant. At Jacobs' "initial check-up" in the medical department, just six days after she arrived at Marianna (and at least six weeks after she incurred the injury), Abad approved an x-ray of Jacobs' leg. Although Jacobs repeatedly describes the results of the x-ray as showing a fractured leg, she admits the actual findings were a "healing stress fracture" (doc. 16 at

5, ¶ 13) (emphasis added). Abad responded to this diagnosis by prescribing pain medication, restricting Jacobs' activities, issuing an ankle brace, and ordering a follow-up x-ray. Over the course of Jacobs' seventeen-month stay at Marianna, she was seen by medical staff for her condition eleven times, including five times by Abad, twice by Dr. Toledo, and once by Dr. Negron. Jacobs also received five x-rays, and a continuous prescription for pain medication. None of the x-rays indicated that her condition was worsening. Although the October 21, 2010, x-ray characterized the condition of Jacobs' leg as "abnormal," the actual finding was the same as the first x-ray, that is, focal cortical thickening of the tibial cortex. Even the x-ray performed one year later, on September 22, 2011, read, "negative except for: smooth cortical thickening of medial tibia." Moreover, even if the October 21, 2010 x-ray showed a change in Jacobs' condition, Abad ordered an MRI at Jacobs' next appointment with her on January 10, 2011. Jacobs did not receive the MRI, but that was not due to any conduct on the part of Abad or Negron, it was due to the Utilization Review Committee's rejecting Abad's request for an MRI.

With regard to Abad and Negron's alleged failure to monitor the effects of the Indomethacin, the facts show that Abad prescribed the medication on August 16, 2010. Nurse Cloud discontinued it on August 27, 2010, and substituted Ibuprofen. The prescription for Indomethacin was subsequently reissued, and although Jacobs states she complained of stomach problems which she associated with the drug on November 14, 2010, she does not allege she complained to Abad, or that Abad was otherwise made aware of the problem at that time. Months later, on February 16, 2011, Abad advised Jacobs to continue taking her pain medication, but even then Jacobs does not allege she advised Abad that the medication was causing problems. On March 9, 2011, when Jacobs submitted an inmate request to the medical department expressing concern about the effects of her combined medications and requesting monitoring, she received a blood test a week later. When Abad reviewed the results of that blood test, she discontinued the Indomethacin. After that, Dr. Toledo advised Jacobs he would change her pain medication every three months to avoid stomach problems and any potential kidney or liver damage from the Indomethacin.

Given the facts in this case, the undersigned rejects Jacobs' argument that Carswell put Abad and Negron on notice that their response to her medical need was unconstitutional. Further, Jacobs' reliance on the chiropractor's affidavit and internet articles to show that Defendants' conduct did not conform to the "applicable standard of care" in relation to her condition is insufficient to show

deliberate indifference. *See* Estelle, 429 U.S. at 106 ("Medical malpractice does not become a constitutional violation merely because the victim is a prisoner.").

The facts of this case are more similar to those of Estelle v. Gamble, 429 U.S. 97 (1976). In Estelle, Inmate Gamble alleged he was injured during his prison work assignment. *Id.* at 99. Gamble claimed that his lower back strain, pain in his chest, arm and back, migraine headaches, and high blood pressure were not properly treated, that his pain continued for months, and the prison refused to bring him to the doctor when he requested it. *Id.* at 99–101. The Supreme Court held that Gamble's allegations were insufficient to establish an Eighth Amendment claim:

> Gamble was seen by medical personnel on 17 occasions spanning a 3-month period: by Dr. Astone five times; by Dr. Gray twice; by Dr. Heaton three times; by an unidentified doctor and inmate nurse on the day of the injury; and by medical assistant Blunt six times. They treated his back injury, high blood pressure, and heart problems. Gamble has disclaimed any objection to the treatment provided for his high blood pressure and his heart problem; his complaint is "based solely on the lack of diagnosis and inadequate treatment of his back injury." The doctors diagnosed his injury as a lower back strain and treated it with bed rest, muscle relaxants and pain relievers. Respondent contends that more should have been done by way of diagnosis and treatment, and suggests a number of options that were not pursued. The Court of Appeals agreed, stating: "Certainly an x-ray of (Gamble's) lower back might have been in order and other tests conducted that would have led to appropriate diagnosis and treatment for the daily pain and suffering he was experiencing." 516 F.2d at 941. But the question whether an X-ray or additional diagnostic techniques or forms of treatment is indicated is a classic example of a matter for medical judgment. A medical decision not to order an X-ray, or like measures, does not represent cruel and unusual punishment. At most it is medical malpractice, and as such the proper forum is the state court . . . .

*Id.* at 107 (citations to record omitted).

Case law as it existed at the time of Defendants' conduct did not make it obvious that the medical care they provided was grossly inadequate or so cursory as to amount to no treatment at all. Therefore, they are entitled to qualified immunity. *See, e.g.*, Mcall v. Cook, 495 F. App'x 29, 30 (11th Cir. 2012) (unpublished) (defendant prison doctor was not deliberately indifferent to prisoner plaintiff's back, hip, and thigh-pain-related medical needs where defendant examined plaintiff on six occasions for back-pain-related reasons and prescribed pain medication; while plaintiff may have had a serious medical need that was later discovered at a different facility, defendant doctor's

decision not to order x-ray or other diagnostic imaging was a medical judgment that did not amount to deliberate indifference).[6]

Accordingly, it is respectfully **RECOMMENDED** that:

1.      Defendants' motion to dismiss (doc. 43) be **GRANTED**.

2.      Plaintiff's Amended Complaint be **DISMISSED with prejudice**, pursuant to Fed. R. Civ. P. 12(b)(6), because the allegations fail to state a claim upon which relief can be granted.

3.      The clerk be directed to close the file.

At Pensacola, Florida, this 12th day of November 2013.


/s/ Elizabeth M. Timothy
**ELIZABETH M. TIMOTHY**
**UNITED STATES MAGISTRATE JUDGE**


### NOTICE TO THE PARTIES

**Objections to these proposed findings and recommendations may be filed within fourteen (14) days after being served a copy thereof.  Any different deadline that may appear on the electronic docket is for the court's internal use only, and does not control.  A copy of objections shall be served upon the magistrate judge and all other parties.  Failure to object may limit the scope of appellate review of factual findings.  *See* 28 U.S.C. § 636; United States v. Roberts, 858 F.2d 698, 701 (11th Cir. 1988).**

---

[6] The undersigned cites McCall only as persuasive authority and recognizes that the opinion is not considered binding precedent.  *See* 11th Cir. R. 36-2.